268 So.2d 410 (1972)
FIRST REALTY CORPORATION OF BOCA RATON, Appellant,
v.
STANDARD STEEL TREATING COMPANY, a Michigan Corporation Qualified to Do Business in the State of Florida, and Bahama Hotel, Inc., a Florida Corporation, Appellees.
No. 71-266.
District Court of Appeal of Florida, Fourth District.
August 7, 1972.
Robert D. Tylander, and David B. VanKleeck, of Tylander, deClaire, Becker & VanKleeck, Boca Raton, for appellant.
*411 Marshall G. Curran, Jr., of English, McCaughan & O'Bryan, Fort Lauderdale, for appellee  Standard Steel Treating Co.
OWEN, Judge.
In 1969 the Bahama Hotel in Fort Lauderdale was sold. Appellant (a real estate broker), alleging that it had been the procuring cause of the sale, brought this suit against the seller and the buyer, seeking a commission from the seller on both implied contract and quantum meruit, and damages from both defendants for conspiracy to deprive appellant of the commission. After extensive discovery had been completed, the seller sought and obtained summary judgment in its favor. This appeal is from that judgment.
In our judgment, upon a review of the pleadings, depositions, interrogatories and requests for admissions, not only are there genuine issues of material fact present in this case, but also there are conflicting inferences which may properly be drawn from facts which are not disputed. We summarize these facts and inferences in a light most favorable to appellant as follows:
Appellee Standard Steel Treating Company, whose principal officer was Paul Ternes, was the owner of the Bahama Hotel in Fort Lauderdale. In August, 1967, the hotel was listed for sale through the firm of L.C. Judd & Company for a price of $940,000. At that time Bruce Alger, an agent of appellant, produced as a prospect for the property one Robert Bolt, who submitted a written offer of $900,000. Although Mr. Bolt and Mr. Ternes were introduced at that time, and there were some further discussions or negotiations over the next few weeks, Bolt's offer was not accepted and was ultimately withdrawn in September.
Nearly one year later, in August, 1968, Bolt informed appellant of his continued interest in the Bahama Hotel property. One of appellant's agents immediately ascertained from Ternes that the property was still for sale, that no broker held an exclusive listing, and that the asking price was $965,000. Bolt was advised, and he submitted a written offer of $800,000. Although Ternes promptly rejected this offer, he implied that he would entertain an offer of $900,000. Consequently, a few weeks later Alger prepared for Bolt's signature a written proposal to offer $900,000 for the property, mailing the proposed contract to Bolt with the recommendation that he execute the same and authorize its submission to Ternes. In October Bolt responded to Alger's recommendation by stating that he (Bolt) would not be interested in the property at a price anywhere near $900,000, and at the same time intimated his suspicion that Algers' recommendation of the $900,000 price was strongly motivated by a desire to earn a commission. Following that rebuff, neither Alger nor any other agent or representative of appellant actively sought further negotiations between Ternes and Bolt despite the rather extensive negotiations which had transpired during the two months immediately preceding.
Notwithstanding Bolt's apparent lack of interest in the property (as indicated by his letter to Alger in October), shortly thereafter Bolt telephoned Ternes expressing interest, and in January, 1969, Ternes communicated directly with Bolt by telephone to inquire as to whether the latter was still interested in purchasing the hotel. Following Bolt's affirmative response to this inquiry, arrangements were made for Ternes and Bolt to meet and discuss the matter in further detail, resulting in a three-day meeting in Florida in early March. At this meeting Ternes and Bolt settled most of the details of a proposed purchase of the hotel, including a sales price of $900,000 and a provision for Bolt to indemnify Ternes against any real estate commission which might be due appellant from the sale. Remaining details were settled by their meeting in April (in Detroit) and their meeting in May (in Cincinnati), resulting in the sale being consummated in July, 1969. Appellant was unaware of *412 these several meetings between Ternes and Bolt, and only became aware of the sale of the hotel approximately one month after the sale had been closed.
If a broker has brought the parties together and the sale is effected as a result of continuous negotiations inaugurated by the broker, he will be entitled to his commission even though the sale is eventually consummated on different terms and at a different price. Shuler v. Allen, Fla. 1955, 76 So.2d 879. Since it is undisputed that Bolt was appellant's customer and that it was through appellant's efforts that Ternes became aware of Bolt as a prospective purchaser of the hotel property, the broad question arises as to whether the broker conducted continuous negotiations between Ternes and Bolt, within the definition of that term as set forth in the Shuler case.
Appellee contends that there were three separate rounds of negotiations, i.e., those which commenced in August, 1967, those which commenced in August, 1968, and those which commenced in March, 1969, and that as a matter of law there was a hiatus or break between each separate round of negotiations. On the other hand, as it might be expected, appellant contends that all negotiations which led up to the sale were continuous in nature, particularly those following the time of the offer submitted through appellant in August, 1968. If we start with this latter date, it would seem without dispute that from then through the early part of October appellant was conducting continuous negotiations between Bolt and Ternes, and it also seems without dispute that commencing in January, 1969, there were continuous negotiations between Bolt and Ternes (in which appellant did not participate), which negotiations culminated in the sale of the hotel. Thus, the broad inquiry of whether the sale was the result of continuous negotiations inaugurated in August, 1968, narrows into two limited questions, i.e., (1) did the "gap" between the latter part of October, 1968 and the early part of January, 1969 break the continuity as a matter of law, and if not (2) did appellant's failure to participate in the later negotiations held directly between Bolt and Ternes preclude it as a matter of law from the benefit of such negotiations.
First, was the absence of active negotiations between the latter part of October, 1968 and the early part of January, 1969, such that it can be said as a matter of law that it amounted to a break in the continuity of negotiations inaugurated in August, 1968? In our judgment the facts and circumstances of this case would not permit that determination as a matter of law, although upon trial it may be so found and determined as a matter of fact. What is continuous negotiation in a given case does not admit of a precise time formula whereby following each offer there must be an acceptance or a counter-offer within a limited specified period of time in order to keep the negotiations alive. This transaction involved not only a substantial sum of money but also a going business. There were undoubtedly many factors which each party had to consider on a transaction of this magnitude, not the least of which would be the timing and strategy of making the next move in the negotiations. For example, it is quite conceivable that each party, though very much interested in continuing negotiations, nonetheless delayed making any overture to the other, either in the hope that by adopting the appearance of indifference to the trade his bargaining position might be enhanced, or out of concern that by showing any sign of eagerness or overanxiety his bargaining position might be weakened. We use this merely as illustration to point out why the circumstances of this case simply will not admit of a determination by the court as a matter of law that there was a break in the continuity of the negotiations.
Second, if the trier of fact determines that there were continuous negotiations between the buyer and seller following the negotiations inaugurated by appellant in August, 1968, does appellant's failure to participate in any of these negotiations *413 after October, 1968, preclude it as a matter of law from having the benefit of those negotiations? We hold that it does not. When the broker has brought the prospective parties together, they cannot complain that the broker did not participate in negotiations when they have purposely excluded the broker from these negotiations by dealing with one another directly and in secret. National Airlines, Inc. v. Oscar E. Dooly Associates, Inc., Fla.App. 1964, 160 So.2d 53; Moylan v. Estes, Fla.App. 1958, 102 So.2d 855; Mead Corporation v. Mason, Fla.App. 1966, 191 So.2d 592.
There was also a basis in these facts upon which the trier of fact could find the seller liable in damages under the tort count. True, there was no direct evidence in the form of an admission by either buyer or seller that they had conspired to deprive appellant of the commission on the sale, but there is certainly ample circumstantial evidence of such, viz: (1) Bolt's caustic rejection of Alger's recommendation that an offer of $900,000 be submitted, coupled with an apparent abrupt "cooling" of interest in the property, only to be followed almost immediately by establishing direct contact with Ternes, and within a few months thereafter negotiating to purchase at the very figure recommended by Alger; (2) the parties' conducting such negotiations in secret when they reasonably should have known that appellant had not abandoned its hope of bringing the parties together and would expect a commission for services in so doing; and (3) the fact that the parties agreed in writing for Bolt to indemnify the seller against any commission due appellant. The facts in this case are not substantially dissimilar to those found in Mead Corporation v. Mason, supra, and Oro Verde Groves, Inc. v. Fuchs, Fla.App. 1962, 136 So.2d 12.
For the reasons stated, we are of the view that the court erred in entering the summary judgment in favor of the seller. That judgment is reversed and the cause remanded for further proceedings.
WALDEN, J., concurs.
MAGER, J., dissents with opinion.
MAGER, Judge (dissenting):
The presumption in favor of the correctness of the judgment appealed from and the burden of appellant to make error clearly appear must be considered in pari materia with the following principle: on an appeal from a summary judgment the record will be viewed in a light most favorable to the appellant and against the moving party in the trial court. Robinson v. City of Miami, Fla.App. 1965, 177 So.2d 718.
In recognition of the foregoing, it is my opinion that even considering the record in its most favorable light to the appellant the judgment of the trial court is correct and should be affirmed.
The function of summary judgment is to determine if there is sufficient evidence to justify a trial upon the issues made by the pleadings, depositions, interrogatories and admissions, in order to expedite litigation and obviate expense. Page v. Staley, Fla. App. 1969, 226 So.2d 129. As this court pointed out in Page, "the criteria is whether from the record there is a genuine issue as to a material fact ...". And as this court equally pointed out in Byrd v. Leach, Fla.App. 1969, 226 So.2d 866, "the term `genuine issue' means a real, as opposed to a false or colorable, issue ...".
If the facts are established beyond dispute the question then arises whether one party or the other should be awarded a judgment as a matter of law; and that question is to be decided by the trial judge using the established facts as a premise. Humphrys v. Jarrell, Fla.App. 1958, 104 So.2d 404. This is precisely what the trial court has done, namely, utilize the established *414 facts to decide which party as a matter of law was entitled to judgment.
In considering established facts all reasonable inferences can and should be drawn from the record even if the facts are undisputed and if such reasonable inferences give rise to a genuine issue of material fact then summary judgment should be denied. Byrd v. Leach, supra. However, such inferences must be reasonably susceptible of being gleaned from the facts presented and should be something more than mere supposition; the inference must be raised by the proofs and "not created from vapors in the atmosphere". Turner Produce Co. v. Lake Shore Growers Coop. Ass'n, Fla.App. 1969, 217 So.2d 856, writ disch. Maryland Nat. Ins. Co. v. Lake Shore Growers Cooperative Ass'n, Fla. 1969, 228 So.2d 276. See also Champion Map Corporation v. Chamco, Incorporated, Fla.App. 1970, 235 So.2d 50; Walter S. Hardin Realty Co. v. Barolo, Fla.App. 1966, 198 So.2d 334; Chapman v. Tison, Fla.App. 1962, 137 So.2d 605.
In the case sub judice, the appellant seeks to recover a broker's commission on the basis that as a matter of law his efforts were the "procuring cause" in the sale of the property in question; that as a matter of law the "continuous negotiations" requirement either was met or was not necessary in view of the fact that the appellant was the procuring cause for the sale.
The record as well as the briefs simply do not seriously reflect or urge that material fact issues exist. In particular an examination of the appellant's points on appeal clearly reflect that the issues before the trial court as well as this court are issues of law rather than of fact. The appellant's points are directed to the correctness of the trial court's interpretation of the law and the evidence with respect to the "continuous negotiations" requirement and with respect to the existence of a conspiracy.[1] Further, a reading of appellant's brief supports the proposition that the sum and substance of appellant's contentions is, almost exclusively, a dissatisfaction with the correctness of the court's interpretation of the facts and the court's application of the law to such facts as distinguished from a serious contention that genuine issues of material fact exist and remain to be resolved.
Even the assertion by appellant of the existence of a "conspiracy" does not reach the level of being a genuine issue. In this regard the following partial excerpt from the testimony of the appellant broker is pertinent:
"Q. Would you tell me if anybody has testified or told you that Mr. Bolt and Mr. Ternes got together and conspired to beat you out of a commission?
"A. Nobody told me that, no.
"Q. Did you personally hear any conversation between Mr. Bolt and Mr. Ternes?
"A. No.
"Q. What do you base that statement on that there is a conspiracy?
"A. My intimate knowledge which is more than anyone else in the case, probably, of the development of the transaction from the inception all the way through to the cancellation of the final contract."
*415 The issue of conspiracy is not a genuine one as contemplated by case law but rather one arising out of the feelings and intimate knowledge of the appellant instead of admissible and provable facts. Byrd v. Leach, supra; Harvey Building, Inc. v. Haley, Fla. 1965, 175 So.2d 780; National Airlines v. Florida Equipment Co., Fla. 1954, 71 So.2d 741.
It was on this very point that the trial court's order in the case sub judice concluded:
"... While the court could speculate that such a plot existed, nonetheless, there is no evidence that Defendant, STANDARD STEEL TREATING COMPANY, conspired with anyone, and Plaintiff cannot be permitted to recover on mere speculation nor would a jury be warranted in finding for Plaintiff on such speculation." (Emphasis supplied.)
In my view the issues of fact suggested by the majority are not supported by the record nor reasonably inferable therefrom. Factual issues which could have been presented but were not and issues which the parties themselves have not seriously asserted ought not to serve as a predicate upon which summary judgment, once granted, should be reversed; moreover, a pyramiding of inferences should be avoided. Byrd v. Leach, supra.
All of the salient facts before the trial court, although complex, were essentially not in dispute. No doubt, for that reason the able trial judge prepared an extensive and elaborate order painstakingly setting forth the chronology of events. In my opinion, the order patently reflects the absence of disputed material fact issues; and this court should cautiously avoid a disposition that necessitates injecting fact issues into a record that is otherwise devoid of such issues.
It is one thing for a party to urge and argue that a genuine issue of material fact exists so as to preclude the entry of a summary judgment; it is quite a different thing to disagree with the interpretation placed upon certain facts or the correctness of the legal principles applied to such facts. This case is one that should be decided on questions of law and no useful purpose would seem to be served by sending the cause back where there are no genuine issues of fact to be resolved. The trial court correctly decided the case as a matter of law and its judgment should be affirmed.
NOTES
[1] INVOLVED ON APPEAL"
POINT I
"Did the trial court correctly interpret the law and the evidence in entering judgment on Count I and Count II on the grounds stated in the judgment?
A. Was there a requirement that negotiations be continuous under the instant circumstances?
B. If so, was it satisfied?
C. Was there no evidence of negotiations between broker and buyer of which seller was aware?
POINT II
"Did the trial court correctly interpret the law and the evidence in entering judgment on Count III on the grounds stated in the judgment?
A. Was there no evidence of a conspiracy?"