319 So.2d 604 (1975)
JACQUIN-FLORIDA DISTILLING COMPANY, a Florida Corporation, Appellant,
v.
REYNOLDS, SMITH AND HILLS, ARCHITECTS-ENGINEERS-PLANNERS, INCORPORATED, a Florida Corporation, Appellee.
No. X-302.
District Court of Appeal of Florida, First District.
October 10, 1975.
*605 James A. Bledsoe, Jr., and Dana G. Bradford, II, Mahoney, Hadlow, Chambers & Adams, Jacksonville, for appellant.
David W. Carstetter, Kent, Sears, Durden & Kent, Jacksonville, for appellee.
*606 SMITH, Judge.
Jacquin-Florida Distilling Company appeals from a judgment against it in the amount of $14,391.75, without interest or costs, on a claim by Reynolds, Smith and Hills, Architects-Engineers-Planners, Incorporated (RS&H), for fees earned and disbursements made under a contract to provide engineering services necessary to the modification of the waste treatment process at Jacquin's Auburndale distillery to comply with urgent State requirements. Upon waiver of jury trial, the lower court as trier of the facts entered judgment for RS&H in the amount of its unpaid statements, but declined to allow interest and costs to RS&H, which has cross-assigned error in that ruling.
Jacquin paid only the first RS&H invoice in the amount of $397.78 and refused to pay several others, aggregating the amount of the judgment, when controversy arose over the amount of a $9,500 charge for labor, materials and laboratory reports incident to the installation of a small pilot plant to collect data at the distillery for less than a month during December 1972.
The printed form of contract[1] which the parties signed at the instance of RS&H did not identify, except in generalities consistent with all conceivable projects but descriptive of none, the engineering services to be rendered and paid for. The provision for Jacquin's payment of fees in the amount of RS&H payroll costs times a factor of 2.5, when considered with the uncertainty of the extent of services contracted for, would make it difficult for either owner or engineer to predict at the outset of the engagement the extent of the owner's obligation for engineering fees. Yet, as though to balance the burden of this uncertainty, the contract placed firmly in Jacquin's hands a recurring right to end RS&H's services at logical intervals. Thus, the contract divides the undertaking into three distinct design phases of schematic planning, preliminary design and final design, each of which begins only on the owner's "written authorization to proceed" and ends with the engineer's submission of design documents appropriate to that phase and updated estimates of the project costs excluding engineering services. At the completion of the third or final design phase, the contract contemplates that the engineer, again on the owner's "written authorization to proceed," will furnish additional services in the bidding or negotiating phase and the construction phase.
The schematic planning phase of this project yielded a written report by RS&H of the considerations involved in the problems at hand, general alternative solutions and recommendations, preliminary design criteria and a preliminary costs estimate, all as required by the contract.[2] On about November 5, 1972, according to RS&H project manager Morgan, RS&H recommended to Jacquin that a small pilot plant be operated to collect waste treatment data useful in preparing the "preliminary design documents consisting of final design criteria, preliminary drawings and outline specifications" which the contract described as the fruit of the preliminary design phase. On November 8, general manager McHaffie of Jacquin mailed RS&H written authorization to proceed into the preliminary design phase.
There are irreconcilable conflicts in the testimony concerning communications about the pilot plant. Morgan of RS&H testified that on November 21 he orally notified McHaffie that the original estimate of five to six thousand dollars had been revised upward to $9,500 and that McHaffie *607 orally accepted the revised estimate on that date, two weeks before the plant was installed on December 7. McHaffie, on the other hand, testified that RS&H did not propose the pilot plant until after Jacquin's written authorization to proceed in the preliminary design phase had been solicited and given on November 8, that Morgan said the pilot study would not cost over $5,000, that the pilot plant was installed before Thanksgiving and that he, McHaffie, did not learn of the revision to $9,500 until he received Morgan's letter to that effect on December 11.
While we are handicapped by the trial court's failure to make findings supporting its disposition of the matters in controversy, Townsend v. Giles, 133 So.2d 451 (Fla.App. 1st, 1961), appellant's assertion of error in the trial court's failure to make findings cannot be sustained under Florida practice. Dworkis v. Dworkis, 111 So.2d 70 (Fla.App.3d, 1959); American Motor Inns of Fla., Inc. v. Bell Elec. Co., 260 So.2d 276 (Fla.App. 4th, 1972). Appellant's citations of decisions in jurisdictions requiring findings are inapposite. Contrast Rule 52, Fed.R.C.P. In this case we are able to ascertain the trial court's unstated findings necessary to the conclusion it reached. Our duty in these circumstances is to accept the evidence favorable to the party prevailing below and to disregard the conflicting evidence supporting appellant's position. Richards v. Dodge, 150 So.2d 477 (Fla.App. 2nd, 1963); Coble v. Agnew, 128 So.2d 158 (Fla.App. 2nd, 1969); Pergament v. Pergament, 117 So.2d 26 (Fla.App. 2nd, 1960). See also Peacock v. Peacock, 207 So.2d 292 (Fla.App. 1st, 1968).
Resolving these conflicts favorably to the position urged in support of the judgment below, we must presume that the trial court found on substantial evidence that, after initial misconceptions by both RS&H and Jacquin of the cost of the pilot plant, Jacquin permitted the plant to be installed at its distillery on December 7, two weeks after Jacquin was orally informed of the increased cost, that Jacquin permitted the plant to continue operation after December 11, when Jacquin admits receiving Morgan's letter confirming the increased cost, and that Jacquin permitted the plant to complete its scheduled course even after December 20, when Jacquin's vice-president first protested the increased charge. In these circumstances the trial court must have concluded, and we agree, that Jacquin, having authorized RS&H to proceed in the preliminary design phase, became indebted to RS&H for engineering services rendered by it[3] in that phase and was obliged to make prompt payment of statements submitted pursuant to paragraph 6.2.1 of the contract, providing:
"The OWNER will make prompt monthly payments in response to the ENGINEER's monthly detailed statements for all categories of services rendered under this Agreement and for reimbursable expenses incurred."
We have considered Jacquin's argument that RS&H cannot recover for its services in the absence of proof that its invoices were unpaid for more than sixty days, relying on paragraph 6.3.6 of the agreement, reading:
"If the OWNER fails to make any payment due the ENGINEER on account of his services and expenses within sixty days after receipt of the ENGINEER's bill therefor, the amounts due the ENGINEER shall bear interest at the legal *608 rate in force at the principal place of business of the ENGINEER from said sixtieth day, and in addition the ENGINEER may, after giving seven days' written notice to the OWNER, suspend services under this Agreement until he has been paid in full all amounts due him on account of his services and expenses."
While it is evident that the RS&H invoices remained unpaid for long beyond sixty days, paragraph 6.3.6 relates only to the time when interest begins to be payable and the engineers' services may be suspended. That paragraph has no effect on Jacquin's responsibility to promptly pay statements for engineering services rendered during a design phase undertaken with written authorization to proceed.
Jacquin argues also that it had no obligation to pay for engineering services rendered during the preliminary design phase because it never received the design documents and written reports which RS&H was to have submitted at the conclusion of that phase.[4] But the contract does not permit an interpretation that RS&H became entitled to compensation only at the conclusion of each phase upon preparing and submitting the written documentation resulting from its prior work. Because RS&H was justified by paragraph 6.3.6 in suspending services in February 1973 for nonpayment of its statements beginning with that of November 30, 1972, RS&H's consequent failure to complete the preliminary design phase by preparing and submitting a written preliminary design did not affect its right to compensation for services rendered until the time services were justifiably suspended.
We have also considered appellant's contention that the contract was indivisible and that the engineers were not to be compensated for any services unless and until the entire undertaking was performed by the successful modification of its waste treatment process. That argument is untenable. The contract, providing for periodic payments and successive renewals of the owner's authorization to proceed in each phase, plainly cannot be regarded as imposing an indivisible obligation on the engineer to perform the services required in all phases or else sacrifice compensation for work done satisfactorily in early phases.
The trial court, evidently concluding that there are inequities in RS&H's position notwithstanding the debt due, disallowed interest and costs to RS&H. While there is authority for such action in cases formerly cognizable in equity [Edwards v. John O. Evans Const. Co., 155 Fla. 263, 19 So.2d 799 (Fla. 1944)] § 57.041, F.S. 1973, provides that a party recovering judgment in an action at law "shall recover all his legal costs and charges." RS&H is likewise entitled to interest on the debt as a result of Jacquin's failure to pay when due, irrespective of Jacquin's good faith in contesting the claim. Parker v. Brinson Constr. Co., 78 So.2d 873 (Fla. 1955); Nationwide Mutual Ins. Co. v. Griffin, 222 So.2d 754 (Fla.App. 4th, 1969); Florida Home Ins. Co. v. Braverman, 163 So.2d 512 (Fla.App.3d, 1964).
The judgment below will be affirmed insofar as it resolves the principal controversy favorably to appellee, but reversed with instructions for the entry of an amended judgment to include costs, to be taxed in the trial court, and interest on the invoice amounts aggregating the principal debt at *609 the rate of six percent per annum from dates beginning sixty days after submission of RS&H's invoices until the date of entry of the amended judgment.
Affirmed in part, reversed in part.
McCORD, Acting C.J., and MILLS, J., concur.
NOTES
[1] The form was published by the National Society of Professional Engineers and was entitled "Standard Form of Agreement between Owner and Engineer for Professional Services," SPE 1910-1 (1970 Edition).
[2] Jacquin did not pay RS&H's invoice for $2,197 covering services in this phase.
[3] The pilot plant was installed and monitored not by RS&H but by an affiliated engineering firm. While the point was made below that RS&H's referral of this work constituted the acquisition of "additional services" from others for which explicit written authorization by the owner was necessary, that point has not been urged before this Court. We therefore treat the pilot plant, as the parties have treated it here, as engineering services rendered by RS&H for which a charge of $9,500 would be justified by the formula of payroll costs times a factor of 2.5, as provided for in the contract.
[4] None of the authorities cited by appellant sustains its position as we understand it. One of them, Standley v. Egbert, 267 A.2d 365 (D.C.App. 1970), in which an architect was denied compensation for work performed in the second or design development phase after having neglected to obtain the required approval by the owner of the schematic design, provides a useful contrast with this case.