475 So.2d 925 (1985)
SHELDON GREENE & ASSOCIATES, INC., a Florida Corporation, and Litwin Realty, Inc., a Florida Corporation, Appellants,
v.
ROSINDA INVESTMENTS, N.V., a Netherlands Antilles Corporation, and Harry Horn and Sala Horn, His Wife, Appellees.
No. 84-857.
District Court of Appeal of Florida, Third District.
August 13, 1985.
Rehearing Denied October 4, 1985.
*926 Kline, Moore & Klein and Donald Klein, Miami Beach, for appellants.
Morton B. Zemel, North Miami Beach, Dubbin & Berkman and Andrew H. Moriber, Miami, for appellees.
Before HUBBART, NESBITT and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
Sheldon Greene & Associates, Inc. and Litwin Realty, Inc., real estate brokers, appeal from an adverse judgment entered after a non-jury trial in an action to recover brokerage commissions on the sale of a hotel property known as The Prince Arthur Apartments. We reverse with directions to enter judgment for the brokers.
Our task of deciding this case is made easier by the fact that the trial judge, as the fact-finder, announced that he believed the brokers' version of the pertinent events. That version was as follows.
The purchasers, Mr. and Mrs. Horn, visited Litwin Realty, Inc. to discuss investing in a hotel property. Mr. Pollock, Litwin's agent, introduced the Horns to Mr. Bastacky of Sheldon Greene & Associates, Inc., because that agency had a larger inventory of hotel properties. On two separate occasions, Pollock and Bastacky took the Horns to visit and inspect The Prince Arthur Apartments.[1] The Horns' visits *927 and inspections were done with the full knowledge and approval of the owner's resident manager.[2] According to Bastacky, only when the Horns told him that they were not interested in purchasing the property and when he learned that the Horns had bought another hotel property did he stop communicating with the Horns. Within a year of being shown The Prince Arthur Apartments by Bastacky and Pollock, the Horns contacted an agent for Rosinda Investments, N.V., the owner of the apartments, and directly negotiated the purchase of the apartments. The Horns acquired the property in the name of a corporate entity of which they were half-owners, and it was conveyed by Rosinda to a trustee for the corporation. In sum, then, the brokers showed the Horns the property and had no further involvement in any negotiations only because the Horns misleadingly informed them that they had no interest in purchasing the property.
The trial judge erroneously believed that the brokers had to establish (which clearly and concededly they did not) that there were continuing negotiations between the seller and purchaser conducted by or through the brokers, which ultimated in the sale of the property. This failure, said the trial judge, was fatal to the brokers' claim.
The correct rule of law is not that stated by the trial judge; it is, instead, that a broker, to be considered the "procuring cause" of a sale, must have brought the purchaser and seller together and effected a sale through continuous negotiations inaugurated by him unless the seller and buyer intentionally exclude the broker and thereby vitiate the need for continuous negotiations. Plainly,
"[w]hen the broker has brought the prospective parties together, they cannot complain that the broker did not participate in negotiations when they have purposely excluded the broker from these negotiations by dealing with one another directly and in secret."

First Realty Corp. v. Standard Steel Treating Co., 268 So.2d 410, 413 (Fla.4th DCA 1972).
See Bermil Corp. v. Sawyer, 353 So.2d 579 (Fla. 3d DCA 1977); Alcott v. Wagner & Becker, Inc., 328 So.2d 549 (Fla. 4th DCA 1976) (commission due where seller's property advertised by broker, prospective buyer reads ad and discovers seller is a friend, and consummates sale without broker); Mead Corp. v. Mason, 191 So.2d 592 (Fla. 3d DCA 1966), cert. denied, 200 So.2d 813 (Fla. 1967) (commission due where broker *928 showed buyer property twice, buyer and seller negotiated terms of sale without notifying broker, and agreed as part of purchase contract that no broker was involved). Thus, where the broker is excluded, the requirement of continuous negotiations is quite obviously dispensed with, and the broker is nonetheless deemed to be the "procuring cause" of the ensuing sale. See Realty Marts, Inc. v. Barlow, 312 So.2d 544 (Fla. 1st DCA 1975). Moreover, a broker has done all that he is required to do and is entitled to a commission where he has shown the buyer the property but makes no further efforts because an initial purchase offer is rejected or the buyer expresses no interest in the property. See Crystal River Enterprises, Inc. v. Nasi, Inc., 418 So.2d 1038 (Fla. 5th DCA 1982); Gibbs v. Gibbs, 296 So.2d 613 (Fla. 1st DCA 1974). If the rule were otherwise:
"a crafty prospect could reject the contract submitted by the broker, go behind his back to the owner, modify the terms without affording the broker an opportunity for negotiations, purchase the property and thereby evade, on behalf of the seller, the payment of a commission. Such is not the law of the State of Florida."[3]

Realty Marts International, Inc. v. Barlow, 348 So.2d 63, 64 (Fla. 1st DCA 1977).
Thus, the continuous negotiation requirement is vitiated where the seller and buyer exclude the broker, and the broker need only establish that the seller and buyer dealt him out. While we acknowledge that such descriptive terms as "secret," "clandestine," and "conspiratorial" are often found in the broker commission cases, the use of such terms hardly establishes an additional element of a broker's cause of action for a commission, that is, that the seller and buyer acted with bad motives. In our view, these terms, in this context, mean nothing more than that the buyer has negotiated directly with the seller without the participation of the broker who first called the property to the buyer's attention; this negotiation is called "secret," "clandestine," and "conspiratorial" because only the buyer and seller are in on it.
We therefore conclude that liability for the brokers' commission may be predicated on the simple fact that the seller and buyer, having been brought together by the brokers, strike their own deal. Contrary to the trial court, we conclude that there is no need for continuous negotiations to be conducted by or through a broker once the broker has been excluded by the seller and buyer. Accordingly, we reverse the judgment below with directions to enter judgment for the brokers.
Reversed.
NESBITT, J., concurs.
HUBBART, Judge (dissenting).
I must respectfully dissent. I would affirm the final judgment appealed from in all respects.
The court is in error in stating that the trial judge accepted the brokers' version of the pertinent events of this case, as, admittedly, the final judgment under review contains no findings of fact at all. It is true that the trial judge did state orally during counsels' closing arguments that he was strongly inclined to find, in effect, that the brokers did show the subject property to the buyers as the brokers claimed, but this "finding"  if it can be called that  was confined solely to that disputed fact and nothing more. The trial judge stated:

*929 "THE COURT: Now we are getting into a different issue.
Well, let me say this for the purposes of the record. I am the Judge of the credibility of witnesses and I just about have decided on the issue of the meeting with the Horns [buyers] and Mr. Bastacky [broker]. I am resolving that issue in favor of the plaintiffs' theory. Now, wherever that leads us on the law so be it. I am still not satisfied that that in fact makes a necessity for finding for the plaintiff because of the other matters that are involved.
But, I think we are going to have to concede that fact and the more I sit here and the more I think that I am going to have to resolve that in favor of the plaintiffs. It just doesn't sound logical that Mrs. Litwin would pick the Greene agency and decide to send a mailgram out to them and the Horns on the same day without giving it some credence to their version.
MR. ZEMEL: If the Prince Arthur had been shown to them it doesn't make any sense that she wouldn't send the mailgram to the Prince Arthur and the other properties that had been shown.
MR. KLEIN: Sure it does.
THE COURT: That you can argue separately. I think I have made a statement and I just wanted to clear the air so you fellows know what I am thinking."
T. 391-92. The trial judge never stated  as the court now claims  that it was accepting in toto the brokers' version of the facts of this case, which version is now recited in the court's opinion; nor did he ever incorporate such findings of fact into the final judgment.
Beyond that, the trial judge also made other oral statements throughout counsels' final arguments in this case, which statements leaned toward a version of the facts which was favorable to the seller and buyers below. The trial judge stated that he was much impressed with the fact that the buyers bought another hotel, The Greystone Hotel, after the brokers had allegedly shown them the subject hotel property, The Prince Arthur Apartments (T. 383-84) and that they became interested in The Prince Arthur only after their purchase of The Greystone when, by happenstance, they were put in touch with the seller's agent, Mr. Esmail, through one Pepe, a prospective employee of the seller at The Greystone. (T. 393). The trial judge stated:
"THE COURT: That little scenario, I believe, did happen. I believe that Pepe was there somewhere and came into the picture like your clients claim he did and for the sake of making a finding of fact, I would find that to be the case and this happened at the end of February or March of 1981 and that is how the Horns made contact directly with Mr. Sadru.
Let us say that is a finding of fact."
T. 393.
Moreover, the trial judge further stated that he was leaning toward a finding of no conspiracy between the seller and buyers because the seller was never put on actual or constructive notice that the brokers had shown The Prince Arthur Apartments to the buyers  other than through a legally insufficient contact with Mr. Ali, an employee of the seller, who allegedly let the brokers in to show the property to the buyers. The trial judge stated:
"THE COURT: I am leaning towards conspiracy. I am leaning towards the fact  towards the conclusion that a conspiracy was not proven between the seller and the buyer. In other words, your argument made considerable sense to me, Mr. Greenfield [counsel for seller], as far as the negligence of your client and your argument about the two innocent parties and their never having been put on notice of the fact that the Horns [the buyers] were brought to the premises other than the contact with Mr. Ali.
I am leaning towards that conclusion. Suppose I give the plaintiff ten days within which to file a memorandum and give the defendants ten days to reply. Both defendants will have ten days and *930 then the plaintiff can have five days to file a reply memo.
Okay. Have a nice day."
I am frankly dubious of elevating any of the trial judge's oral expressions in this case to the status of formal findings of fact  as the court herein purports to do  when, as here, the final judgment under review contains no specific findings of fact. Trial judges frequently and quite commendably "think out loud" in colloquy with counsel  much as appellate judges do in oral argument  but there is no law anywhere that I am aware of which states that such oral expressions constitute formal and binding findings of fact in the case. To the contrary, I had always thought that the trial court spoke only through its written orders and that a trial judge in a non-jury trial could always change his mind on any disputed point of fact or law prior to the entry of the final judgment. In the absence, then, of written findings of fact in this case, I think we are compelled by the established law to view the evidence in this record in a light most favorable to sustaining the final judgment under review.[1] The court, in my view, departs from this established law by deciding the instant case based on a set of facts which, admittedly, is most favorable to upsetting the final judgment appealed from  to wit: the brokers' version. In so doing, the court, in effect, has impermissibly reweighed the evidence on appeal and has substituted its judgment for that of the trial court on disputed issues of fact.[2]
Applying then, the correct standard of review in this case, I think there is substantial, competent evidence in the record to sustain the final judgment which was entered below after a non-jury trial. The final judgment under review reads in pertinent part as follows:
"THIS CAUSE came on for trial without jury, and the Court having considered the pleadings, exhibits, testimony of the parties and the witnesses, argument of counsel and having carefully considered the excellent Memoranda filed by the parties, and it being otherwise advised in the premises, the Court finds that under all of the circumstances the Plaintiffs have failed to establish that they were the procuring cause of the sale, and the Plaintiffs have failed to prove that there were continuing negotiations between the seller and purchaser, conducted by or through the broker, and as such have failed to meet the test enunciated by the Court in the case of Shuler v. Allen, Fla. 76 So.2d 879 (S.Ct. 1955), accordingly the Court finds in favor of the Defendants and against the Plaintiffs... ."
R. 143.
There are at least two factual scenarios which the trial court could have accepted based on the testimony adduced below  either one of which is legally sufficient, in my view, to sustain the legal conclusions reached by the final judgment herein.
First, the trial judge could have concluded after a mature consideration of all the evidence in the cause that, in fact, the brokers did not show The Prince Arthur Apartments to the buyers in this case  a finding which, admittedly, is fatal to the brokers' claim in this case. The buyers, Mr. and Mrs. Horn, testified most strongly to that effect below, and even interrupted the trial to protest the broker's contrary testimony. Indeed, the buyers continue to insist on appeal that their version of the facts was the correct version on this point.[3] It is true that the trial judge was strongly inclined at the time of the final arguments at trial to find otherwise, but, in my view, *931 his oral expressions to that effect do not constitute formal findings of fact to which he was forever bound, as the court herein concludes. I think the trial judge could have changed his mind on this point prior to entering the final judgment and concluded that the brokers, in fact, had never shown the subject property to the buyers at any time which finding obviously defeats the brokers' entire claim. The court, however, brushes aside this plainly insuperable obstacle to reversal by treating  incorrectly I think  part of the trial court's oral expressions at trial as formal findings of fact and stating  again incorrectly  that the appellees concede on appeal that the brokers showed the subject property to the buyers. Based, as it is, on these incorrect factual assumptions, I think the court's entire analysis of this case must necessarily fall of its own weight.
Second, even assuming that such a showing took place, the trial judge could have concluded that there was no conspiracy, secret dealing or concerted effort shown between the seller and buyers to deprive the brokers of a commission by intentionally excluding the brokers from the negotiations which led to the sale of the subject property. In accord with his non-binding oral expressions at trial, the trial judge could have found that the buyers were, in good faith, not interested in The Prince Arthur Apartments when first shown the property by the brokers, that they bought another hotel [The Greystone Hotel] instead, and that they only later became interested in The Prince Arthur when by happenstance they were led to the seller's agent, Mr. Esmail, through one Pepe, a prospective employee of theirs at The Greystone. The trial judge could have further concluded, in accord with his stated inclinations at trial, that the seller had no actual or constructive knowledge of the brokers having shown The Prince Arthur to the buyers, and that, consequently, the seller conspired with no one to deprive the brokers of a commission. True, the brokers may have been allowed by Mr. Ali, an employee of the seller, to show the subject property to the buyers, but notice to Mr. Ali was not notice to the seller. Mr. Ali, at best, was a mere caretaker of the premises with no actual or apparent authority to negotiate a sale of the hotel nor any duty to report the names of those who viewed the property to the seller or to Mr. Esmail, the seller's sole designated agent for the sale of the property; moreover, the seller and Mr. Esmail, as is now conceded, had no actual knowledge of this alleged showing. Although admittedly one might draw different inferences on this issue from the record, and the court has certainly done so in this case, there was plainly sufficient evidence presented below to support the above findings.[4] Given, then, the good faith behavior of both the buyers and the seller in this transaction, the trial court could have concluded, based on this record, that no conspiracy, secret dealing, or concerted effort between these parties was ever established to deprive the brokers of *932 their commission. Contrary to the court's analysis of the applicable law, I think this finding is fatal to the brokers' entire claim in this case. There were no negotiations at all  continuous or otherwise  conducted by the brokers between the seller and the buyers which led to the purchase of the subject property; and the seller and buyers acted in complete good faith in engaging in the negotiations which did lead to the purchase of the subject property. Under these circumstances, I think it plain that there can be no recovery for the brokers herein based on the established law of this state.[5]
In sum, then, I think the court, by reversing the judgment below and directing that a judgment be entered for the brokers, has impermissibly reweighed the evidence on appeal and has substituted its judgment for that of the trial court on disputed issues of fact. There is substantial, competent evidence in the record to support the final judgment under review, and the court exceeds its authority in setting it aside. I would affirm.
NOTES
[1] The brokers also showed the Horns some other properties. Subsequently, Litwin learned that the Horns submitted a purchase offer to buy one of these properties directly to the owners, without notifying either Litwin or Sheldon Greene & Associates. Litwin advised the owners of the property of the brokers' claim to a commission in the event of a sale, but no sale was ever consummated.
[2] There is absolutely no question in this record, and the appellees do not seriously contend otherwise (despite the dissenter's contrary view), that the trial court found that the brokers initially showed The Prince Arthur Apartments to the Horns and that the property was shown to the Horns with the full knowledge and approval of the owner's resident manager, Akber Ali. The record reveals that Ali, whom the dissent calls a "caretaker," was the resident manager of the apartments and, along with his duties of renting the apartments and maintaining the building, was required to greet and accompany brokers who were showing the property to prospective buyers. Before the Horns' visits to the property, one of which lasted an hour and a half, Bastacky, accompanied by Ali, had shown the property on nine or ten occasions. Ali's wife kept the books of the apartments.

The owner's official agent, Sadru Esmail, was Ali's brother. While the Horns' later direct contact with Esmail was not brought about by the brokers, that fact is irrelevant, since the Horns were shown the property by Ali. The trial court's view, shared by the dissent, that the owner was required to have actual knowledge that the brokers had shown the property to the Horns, and absent that, the owner acting through Esmail could not have intentionally excluded the brokers, is legally erroneous: actual notice to the seller is not necessary. A realtor having an open listing agreement with the seller "is under no obligation to notify the property owner every time the property is shown," and thus, even absent notification, may be considered the procuring cause of a sale consummated directly between the purchaser and the seller. Realty Marts, Inc. v. Barlow, 312 So.2d 544, 545 (Fla. 1st DCA 1975). See Realty Marts International, Inc. v. Barlow, 348 So.2d 63 (Fla. 1st DCA 1977). See generally 12 Am.Jur.2d Brokers § 232 (1964). A fortiori, where, as here, the owner, through the acts of its de facto agent, Ali, is legally deemed to have had notice of the showing of the property to the Horns, the brokers must prevail.
[3] It is also not the law of the State of Florida that buyers and sellers can be let off the hook for a broker's commission upon a showing, in the words of the dissent, "that the buyers were, in good faith, not interested in The Prince Arthur Apartments when first shown the property by the brokers ... and that they only later became interested in The Prince Arthur when by happenstance they were led to the seller's agent... ." To permit such a defense to a suit for a broker's commission would be virtually to do away with the cause of action. The ludicrousness of the "I wasn't interested" defense is demonstrated in the present case by the fact that the Horns were first shown The Prince Arthur by the brokers in December 1980, bought another property (the Greystone) in February 1981, and contracted to buy The Prince Arthur in April 1981.
[1] Delgado v. Strong, 360 So.2d 73 (Fla. 1978); Shaw v. Shaw, 334 So.2d 13 (Fla. 1976); Crain & Crouse, Inc. v. Palm Bay Towers Corp., 326 So.2d 182 (Fla. 1976); Turner v. Lorber, 360 So.2d 101, 103-04 (Fla. 3d DCA 1978); Cuna Mut. Ins. Society v. Adamides, 334 So.2d 75, 76 (Fla. 3d DCA 1976); see Castille v. Starr, 376 So.2d 935, 936 (Fla. 4th DCA 1979); Heard v. Mathis, 344 So.2d 651, 654-55 (Fla. 1st DCA 1977); Jacquin-Florida Distilling Co. v. Reynolds, Smith & Hills, Architects-Engineers-Planners, Inc., 319 So.2d 604, 607 (Fla. 1st DCA 1975).
[2] We are, of course, specifically prohibited from engaging in such a process on appeal. See, e.g., Shaw v. Shaw, 334 So.2d at 16.
[3] The appellee buyers, Mr. and Mrs. Horn state, in their answer brief before this court:

"PURCHASERS disagree with BROKERS' statement that PURCHASERS were shown the Prince Arthur Apartments, by Bernard Bastacky or Gary Pollack and further that they were introduced to Ali Akberali at the Prince Arthur Apartments. They also deny having been shown the Sea Deck Hotel by BROKERS (Tr. 254).
PURCHASERS denied having met Bernard Bastacky prior to the end of 1981, and accordingly disagree with the statement that they had indicated to Bernard Bastacky that they were not interested in purchasing the Lombardy Inn, the Sea Deck Hotel or the Prince Arthur Apartments."
Appellee Horns' Brief at 2-3.
[4] Thompson v. Sun Oil Co., 135 Fla. 731, 734, 185 So. 837, 838 (1939); Connelly v. Special Rd. & Bridge Dist., 99 Fla. 456, 473, 126 So. 794, 799-800 (1930); see also Ball v. Yates, 158 Fla. 521, 526-27, 29 So.2d 729, 732 (1946) (one who deals with alleged agent in land sale has duty to ascertain extent of agent's authority), cert. denied, 322 U.S. 774, 68 S.Ct. 66, 92 L.Ed. 359 (1947); Robinson v. Aird, 43 Fla. 30, 38, 29 So. 633, 635 (1901) (burden of proof is on plaintiff to show authority of alleged agent to receive notice for his principal); American Ladder & Scaffold Co. v. Miami Ventilated Awning Mfg. Co., 161 So.2d 699, 701 (Fla. 3d DCA 1964) (extent of agent's authority is an issue of fact); One Hour Valet of Am., Inc., v. Keck, 157 So.2d 83, 83 (Fla.2d DCA 1963) (same; "[trial court's] findings will not be set aside unless clearly erroneous.").
[5] See, e.g., Shuler v. Allen, 76 So.2d 879, 882-83 (Fla. 1955); Taylor v. Dorsey, 155 Fla. 305, 308, 19 So.2d 876, 878 (1944); Fearick v. Smugglers Cove, Inc., 379 So.2d 400, 403 (Fla. 2d DCA 1980); Bermil Corp. v. Sawyer, 353 So.2d 579, 585 (Fla. 3d DCA 1977); First Realty Corp. of Boca Raton v. Standard Steel Treating Co., 268 So.2d 410, 413 (Fla. 4th DCA 1972).